# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **ANTONIETTA RINALDI-MISHKA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 C 1305** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **MICHAEL J. ASTRUE,** | ) | **Maria Valdez** |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Antonietta Rinaldi-Mishka's ("Rinaldi-Mishka" or "Claimant") claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Rinaldi-Mishka's motion for summary judgment [Doc. No. 14] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

## BACKGROUND

### I. PROCEDURAL HISTORY

Rinaldi-Mishka originally applied for Disability Insurance Benefits on April 2, 2008, alleging disability since July 15, 2006. (R. 36) Her application was denied

initially on July 16, 2008 and upon reconsideration on November 13, 2008. (*Id.*) Rinaldi-Mishka filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on March 23, 2010. (*Id.*) Rinaldi-Mishka personally appeared and testified at the hearing and was represented by counsel. (*Id.*) A vocational expert also testified. (*Id.*)

On October 20, 2010, the ALJ denied Rinaldi-Mishka's claim for benefits and found her not disabled under the Social Security Act. (R. 46.) The Social Security Administration Appeals Council denied Rinaldi-Mishka's request for review (R. 1-3), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A.    <u>Background</u>

Rinaldi-Mishka was born on January 19, 1971. (R. 164.) She married her current spouse in 2002 and has a six year old daughter. (R. 165.) She worked as a customer service representative for FedEx for seventeen years, from 1994 through 2006, (R. 173-76), and continued to work there for one hour per day, five days a week, from July 2006 through February 2008. (R. 192.) Rinaldi-Mishka claims disability due to degenerative lumbar disc disease, cervical spine disc herniation, carpal tunnel syndrome, left elbow epicondylitis, and mental impairments of depression and anxiety related disorder. (R. 38.)

In her application, Rinaldi-Mishka reported that she is in pain most of the day. (R. 219.) She can no longer write, type, use the phone, sit, or lift objects with any regularity. (R. 216.) The pain also affects her at night and prevents her from sleeping more than three or four hours. (*Id.*) She wakes up with swollen fingers and her hands often cramp. (R. 222.) She reported neck and back pain, numbness, tingling in her hands, and throbbing in her elbows, (R. 216), and has trouble lifting more than five pounds, bending over, standing, sitting, climbing the stairs, using a pen or pencil, and more (R. 220, 224)—in short, virtually every activity of daily life causes her pain. She attributes the pain to degenerative disc disease in her neck and lower back. (R. 225.) She also started wearing a brace for her left elbow in 2006. (R. 221.)

Rinaldi-Mishka takes part in household duties on a limited basis. She shares child care responsibilities with her husband and mother. (R. 215.) She prepares food on a daily basis, but her cooking is much more limited recently, and she requires help with cooking, cleaning, laundry, and a weekly shopping trip. (R. 217-18.) Her husband does most of the house and yard work. (R. 218.) She reported no hobbies, no regular social activities, and no regular excursions. (R. 219.)

## B. <u>Testimony and Medical Evidence</u>

### 1. *Rinaldi-Mishka's Testimony*

Rinaldi-Mishka testified that she suffers from constant pain in her fingers, hands, elbows, neck, shoulder, lower back, and right hip, and the pain worsened from 2006 until the time of her hearing. (R. 61.) She attributed the upper body pain

to carpal tunnel syndrome, degenerative disc disease and herniated discs, and said that she assumed she was referred to a rheumatoid arthritis doctor for the hip pain. (R. 61-62.) She received no treatment for the neck and lumbar back pain; she had physical therapy for the carpal tunnel in her hands and elbows. (R. 62.) Two doctors suggested surgery as an option, but the claimant chose not to proceed. (R. 73.) She said that she feared it could make her condition worse, based in part on the experiences of her mother-in-law and a coworker, both of whom had multiple surgeries for similar problems without success. (*Id.*)

Rinaldi-Mishka has carpal tunnel in both hands, which causes her hands to cramp when she holds objects. (R. 64.) Some days are worse than others. (R. 70.) She can sometimes pick up and drink a cup of coffee, can pick up coins, and can use a pen, button or zip a shirt, and tie shoes. (R. 65.) These tasks now take her longer than they did before: writing a few checks now takes her thirty minutes, while in the past she reported being much faster at it and requiring fewer breaks. (R. 71.) She uses a computer to check her email, but stays on for no more than fifteen minutes. (R. 65-66.) If she types for ten minutes, she requires a minimum break of fifteen minutes, then can return to typing for another ten minutes. (R. 76.) Her husband carries the groceries and the laundry bag; she limits how much she must lift objects at home, and lifting a gallon of milk "is a chore." (R. 66.) She has also chaperoned two three-hour school field trips, which required watching the children but "nothing physical," and she attends church services but cannot kneel and finds the sitting difficult. (R. 66-67.) She said she can stand for thirty to forty five

minutes, sit for fifteen to twenty minutes without shifting, and walk four to six blocks before the pain makes it too difficult. (R. 63.)

In terms of medications, Rinaldi-Mishka testified that she takes Xanax as needed in order to deal with anxiety, generally once or twice per week. (R. 77.) After taking a dose of Xanax, she sits for fifteen to twenty minutes and finds that the anxiety subsides within an hour. (R. 78.) She struggles to sleep and takes Ambien a few times per week to help her rest, but she generally cannot take the pain medications prescribed to her because they cause bothersome side effects, including drowsiness, stomach discomfort, and light-headedness. (R. 63, 78.)

The claimant testified that while she had worked for one hour per day without difficulty prior to claiming disability, she could not have handled returning to an eight-hour workday in her previous work: she could not perform the repetitive tasks of writing, typing, filing, and phone use. (R. 69.) She also testified that she had a workers' compensation claim, which settled for $200,000 in November 2008. (R. 68.)

## 2. *Medical Evidence*

Dr. Mohammed Alawad examined Rinaldi-Mishka on April 29, 2006, noted her right elbow pain and finger pain, and ordered her to take a reduced work schedule. (R. 280.) He continued to treat her, as described below. (This summary of the medical evidence is roughly chronological.)

Dr. Rolando Garces treated the claimant for right arm pain in June 2006, diagnosing lateral epicondylitis and ordering her to avoid lifting more than three

pounds, wear a brace, and limit the use of her right arm. (R. 261-63.) Upon a referral from Dr. Alawad, Dr. Hamid Mohazab examined the claimant's right elbow and found it unremarkable. (R. 342.)

Dr. Harun Durudogan treated Rinaldi-Mishka for right lateral epicondylitis and right arm radiculopathy beginning in July 2006, restricting her from working with her right upper extremities in July and adding restrictions on lifting, pushing, pulling, and carrying more than two pounds and on repetitive activity for more than fifteen minutes with her right arm in September. (R. 310-11.) He gave the claimant an injection in her right elbow in August and prescribed additional non-surgical treatments. (R. 360.) He also put the claimant on an occupational therapy program, beginning in July, (R. 361), and saw her at least three times in August, reporting that using light compression during sleep and a counter force cuff during waking hours produced a "good result." (R. 460.) While he found her right hand and wrist had a range of motion "within functional limits," the grip and pinch strength indicated a moderate impairment when compared with her left hand. (*Id.*) Dr. Durudogan rechecked her right lateral epicondylitis in September and found that she still had a radiating pain in her arm, and she reported episodes of burning pain in her neck. (R. 358.) He kept her on the occupational therapy program and other treatments. (*Id.*) At her further follow-up occupational therapy appointments, Rinaldi-Mishka reported continued pain in her wrist that limited her gripping ability. (R. 482.) At a follow up later in September she had regained grip strength in her right wrist to make it comparable to her left, while also seeing improvement on

6

other aspects of her wrist strength and a decrease in pain. (*Id.*) But one week later, her pain increased and symptoms returned. (*Id.*) Dr. Durudogan felt that Rinaldi-Mishka "would benefit from surgical intervention," and discussed the risks and benefits with her at length in September. (R. 357.) He indicated that she would be able to return to work the day after that visit. (R. 401.) Rinaldi-Mishka called to report that another doctor had discontinued her occupational therapy until after surgery, stating that she planned to schedule the surgery no earlier than the end of October. (R. 482.) She reported by phone in November that her symptoms remained significant and that a second doctor, Dr. Anton Fakhouri, had recommended surgery. (*Id.*)

In September 2006, upon a referral from Dr. Durudogan, Dr. Mohazab took an MRI of claimant's cervical spine and diagnosed broad based left paracentral herniation at the C6-7 level and post central disc herniation at C5-6. (R. 290.) An MRI of claimant's right elbow led Dr. Joel Leland to indicate a minimal amount of fluid at the distal biceps tendon, "which may be secondary to mild tendonitis." (R. 291.)

In October 2006, Dr. Fakhouri diagnosed lateral epicondylitis in the right elbow with radial tunnel syndrome and right carpal tunnel syndrome. (R. 284.) Claimant was told that she could discontinue her use of a forearm strap, but could and did continue to wear a wrist splint while continuing to take non-steroidal anti-inflammatory medication, although the doctor believed that this treatment "would not resolve her condition." (R. 282.) Dr. Fakhouri presented the option of surgery,

which would allow a return to light work in two to three weeks and full work in two to three months. (*Id.*) Dr. Fakhouri suggested no lifting, carrying, pulling or pushing more than five pounds. (R. 282, 284.) In response to claimant's complaints about wrist pain, the doctor also suggested typing no more than ten minutes per hour and writing no more than ten minutes per hour, and recommended a return to work limited to occasional lifting, carrying, pushing or pulling five pounds or less and no climbing or using tools or equipment. (R. 284, 294.) Dr. Fakhouri included the same restrictions after a November 2006 follow-up examination. (R. 296.)

Dr. Richard Lim treated the claimant for neck pain in October 2006, noting that she had tested positive for carpal tunnel syndrome but negative for radiculopathy. (R. 281.) Dr. Sung-Lana Kim also examined Rinaldi-Mishka in October 2006, diagnosing mild median mononeuropathy at the wrists and finding no evidence of right cervical radiculopathy. (R. 286.)

Dr. John Stogin, Jr. performed an independent medical evaluation on Rinaldi-Mishka in January 2007, diagnosing right lateral epicondylitis as her primary elbow problem, while noting that "she may have some very mild right carpal tunnel syndrome" and "there may be a component of radial tunnel syndrome." (R. 349.) He suggested injections near her lateral epicondyle and potentially for carpal tunnel, finding that her problem was not sufficiently dangerous to warrant surgery, despite that suggestion from Dr. Fakhouri. (*Id.*) Dr. Stogin believed that her discomfort stemmed from repetitive grasping with elbow

flexion and extension, but did not attribute her carpal tunnel syndrome to these activities. (*Id.*)

Upon a referral from Dr. Alawad in December 2007, Dr. Shahrooz Sepahdari examined the claimant's lumbosacral spine and right sacroiliac joint and found no abnormalities in either region. (R. 337.)

In March 2008, Dr. Charles Huang took an MRI of the claimant's lumbar spine and diagnosed early, multilevel, thoracolumbar degenerative disc disease; facet arthropathy; and increased adipose tissue. (R. 307.) In May 2008, Dr. Amir Sepahdari examined Rinaldi-Mishka via an MRI of her left elbow and found partial disruptions of the common flexor tendon group insertion and anterior bundle of the ulnar collateral ligament. (R. 363.)

Dr. Peter Biale reviewed Rinaldi-Mishka's medical information and spent thirty minutes with her for a consultative exam on behalf of the Bureau of Disability Determination Services in June 2008. (R. 375.) He observed her to move without difficulty or discomfort during the exam, and without apparent mental disorder, although she complained of low back pain at one point, (R. 376), and had trouble getting on and off the examination table. (R. 377.) He noted that she experienced pain in her back (and radiating to her legs), right wrist, and left elbow. (R. 375, 377.) Dr. Biale listed his clinical impressions as low back pain from degenerative disc disease and facet arthropathy, neck pain from disc herniation at C5-C6 and C6-C7, right carpal tunnel, and left elbow epicondylitis with pain but a full range of motion. (R. 378.)

9

Dr. Alawad saw the claimant again in May 2008 for her left elbow pain; he noted that the MRI imaging was poor, but expressed a concern that she may have had partial non-complete disruptions of the common flexor tendon group (which might be an element of epicondylitis) and of the anterior bundle of the ulnar collateral ligament. (R. 382.) In July, Dr. Alawad reviewed an MRI of her right elbow and found a minimal amount of fluid that "may be secondary to mild tendonitis." (R. 389.) On the same MRIs, Dr. Daniel Frankel found the results to be negative, while noting the degraded image of the left elbow MRI. (R. 425, 427.) In August, Dr. Alawad completed a residual functional capacity (RFC) assessment for Rinaldi-Mishka and indicated the following limitations: she could sit for one hour; stand for one to two hours; sit and stand for a total of four hours during an eight-hour workday; work in a low stress job; be able to shift positions at will during the workday; and never lift any weight. (R. 386-88.) He indicated she would have significant limitations with reaching, handling, and fingering, and concluded that she could spend "no" time during an eight-hour workday using her hands for fine manipulations, grasping objects, or reaching overhead. (R. 388.) Furthermore, he indicated that her condition would produce "good days" and "bad days" and would keep her from work more than four days per month. (*Id.*)

Dr. Frank Jimenez performed a consultative RFC assessment in July 2008 and found that Rinaldi-Mishka could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (R. 414.) She could occasionally climb stairs,

balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds, and had a limited range of motion in her spine and an inability to squat, according to Dr. Jimenez. (R. 415.) He found no manipulative, visual, communicative, or environmental limitations. (R. 416-17.) He noted that no treating source statement had been provided. (R. 420.)

Dr. Piyush Buch performed a consultative psychiatric RFC assessment in September 2008, including a thirty minute exam, and diagnosed Rinaldi-Mishka with an anxiety state with depressive features. (R. 432-33.) The doctor indicated that the claimant cooperated, had no incoherence, but had an anxious affect throughout the examination. (R. 433.) In summarizing Rinaldi-Mishka's work history, the doctor noted that she "stopped working because she was laid off and she is on workman's comp," and that she cannot work at the present time because of chronic back pain and carpal tunnel syndrome. (R. 432.)

Dr. Leon Jackson completed a psychiatric review in November 2008 and diagnosed an anxiety state with depressive features, reviewing both affective disorders and anxiety-related disorders. (R. 435, 438.) He indicated mild limitations in the first three listing categories: restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 445.) Dr. Jackson concluded that the claimant's psychiatric impairments were not severe. (R. 435, 447.)

Dr. Jennifer Cooper started seeing Rinaldi-Mishka in March 2009. (R. 452.) In an RFC in January 2010, she diagnosed carpal tunnel, tendinitis, and a

herniated disc at the cervical spine; identified symptoms of constant pain, fatigue, insomnia, and depression; and gave the claimant a prognosis of "poor." (*Id.*) She found that the claimant would be incapable of even low stress jobs and that her symptoms would interfere with her attention and concentration constantly. (R. 453.) She could walk two blocks, sit for one hour at a time, stand for one hour at a time, and sit and stand for a total of four hours each during an eight hour workday, according to the RFC. (R. 453-54.) Dr. Cooper also indicated that Rinaldi-Mishka would need unscheduled breaks during the day and a job that allowed her to shift at will between sitting, standing, and walking. (R. 454.) She could lift less than ten pounds rarely, and never more than ten pounds. (*Id.*) She had problems with reaching, handling, or fingering, and could occasionally move her head in various ways, twist, stoop, crouch, or climb stairs. (R. 455.) Dr. Cooper found that the claimant would have good and bad days and would be absent from work more than four days per month, on average. (*Id.*)

Dr. Daniel Hirsen completed a fibromyalgia RFC in May 2010, diagnosing Rinaldi-Mishka with undifferentiated connective tissue disease and giving a prognosis of "fair." (R. 519.) He indicated bilateral pain throughout her body, including spine, chest, shoulders, arms and hands, hips, legs and feet. (R. 520.) He found that she would be incapable of even low stress jobs, could sit for one hour at a time, could stand for one hour at a time, and could sit and stand/walk for a total of less than two hours each in an eight-hour workday. (R. 521.) She could never lift anything even less than ten pounds, could never sustain flexion in her neck (to look

down, for example), could never twist her body, and had significant limitations in repetitive reaching, handling, or fingering, according to the RFC. (R. 523.) Dr. Hirsen did not diagnose fibromyalgia, although he found her syndrome to be largely compatible with it; rather, he found that undifferentiated connective tissue disease was a more appropriate descriptor, which indicates a "mild process of inflamation in the joints due to a mild, incomplete autoimmune disease." (R. 530.) He prescribed hydroxychloroquine, a long-acting anti-inflammatory drug, to control the joint pain. (*Id.*) He also cited Rinaldi-Mishka's depression as having a major effect on her pain and suggested it could preclude subjective improvement if left untreated. (*Id.*) Dr. Hirsen sought to check with the claimant again two months later, but notes from any subsequent appointment with him do not appear in the record.

### 3. *Vocational Expert's Testimony*

The vocational expert (VE) testified that for a person of Rinaldi-Mishka's age, education, and work experience, with the residual functional capacity to perform light work, limited to occasionally climbing ramps and stairs, never climbing ladders, ropes or scaffolds, and occasionally stooping, kneeling, crouching, and crawling, she could work in any unskilled job requiring only light work. (R. 81.) These included office helper, cashier, light cashier, and information clerk; over 58,500 such jobs are available in the metropolitan area. (R. 82.) When limited further to occasional handling and occasional reaching overhead, the VE identified two available jobs—sedentary unskilled information clerk and unskilled information clerk—but did not testify to the number of such jobs available in the

metro area and indicated a "low inconsistency between these two DOT titles." (R. 82-83.) In his earlier testimony, however, the VE indicated that the total number of information clerk positions was 4,000, (R. 82), and in his later testimony the VE identified 2,000 sedentary unskilled information clerk positions, (R. 84), so we deduce that the number of unskilled information clerk positions must be between 2,000 and 4,000. In a second hypothetical, with the added limitations of sedentary work with occasional postural limitations, the VE identified surveillance system monitor, unskilled information clerk, and order clerks, totaling 7,100 jobs. (*Id.*) In a third hypothetical, for an individual who could not lift, push, or pull more than five pounds and could neither type nor write for more than ten minutes per hour, the VE identified sedentary informational clerk and sedentary surveillance system monitor, (R. 86-87); based on his previous testimony, we deduce that the number of such jobs is between 4,200 and 6,200 (between 2,000 and 4,000 sedentary information clerks and 2,200 for surveillance system monitors).

The VE indicated that an absenteeism rate of more than ten percent—that is, an individual that had to miss more than two days per month—would rule out all unskilled positions. (R. 85.) In addition to absenteeism, the VE said that limitations of no reaching, handling, and fingering would be a second "very big problem" that would, presumably, rule out all unskilled positions. (R. 86.)

C.    **ALJ Decision**

The ALJ found that Rinaldi-Mishka had not engaged in substantial gainful activity from her initial onset date of July 15, 2006 through her date of last insured

14

of December 31, 2012. (R. 38.) The ALJ also found that Rinaldi-Mishka had severe impairments of degenerative lumbar disc disease, cervical spine disc herniation, carpal tunnel syndrome, and left elbow epicondylitis. (*Id.*) The claimant had also alleged disability due to depression and anxiety related disorder, but the ALJ found that these mental impairments did not cause more than minimal limitations and were therefore nonsevere. (R. 38-39.) The ALJ stated that none of the impairments, alone or in combination, met or medically equaled any listing of impairments. (*Id.*)

The ALJ next determined that Rinaldi-Mishka had the RFC to perform light work with the following limitations: she could occasionally climb a ramp or stairs; occasionally balance, stoop, kneel, crouch, or crawl; and never climb a ladder, rope, or scaffold. (R. 39.) The decision relied principally on the RFC conclusions of the physicians from the State Disability Determination Services, as well as the statements by Drs. Fakhouri and Lim that the claimant could return to light duty work. (R. 44.) The ALJ rejected the RFC conclusions of Drs. Alawad and Cooper, based on the "minimal findings of carpal tunnel syndrome" and claimant's own description of her daily activities, which included writing, tying her shoes, and more. (R. 43-44.) Dr. Hirsen's RFC assessment was rejected as conclusory and lacking a clear evidentiary basis. (R. 44.) The ALJ also found the claimant to be less than credible based on several factors: her pending workers' compensation claim, which she settled; her work for one hour per day from the onset date through 2008; her decision to forgo carpal tunnel surgery and rely only on physical therapy and medication for her carpal tunnel syndrome; her rating of her pain as a six on a

1-10 scale; her testimony that she could walk four to six blocks; and her statement to her treating physician in 2008 that she was looking for a job. (R. 44-45.) This last factor "suggests that inability to obtain work, as opposed to inability to perform work, may be a motivation behind the current application." (R. 45.) Rinaldi-Mishka's testimony was totally disproportionate to the objective medical findings, according to the ALJ, which did not support limitations to fifteen minutes of sitting. (R. 45.) Furthermore, the claimant's own description of her daily activities did not comport with her description of her limitations. (*Id.*)

On the basis of the RFC assessment and the VE's testimony, the ALJ found that Rinaldi-Mishka could perform her past relevant work as a customer service representative. (*Id.*) In the alternative, the ALJ found that the claimant could perform other jobs that existed in significant numbers in the national economy based on her RFC. (R. 45-46.) Despite the claimant's limitations, sufficient jobs in the regional economy would be available to someone with her age, education, experience, and RFC, according to the ALJ, such that Rinaldi-Mishka is "not disabled" within the meaning of the Medical-Vocational Guidelines. (R. 46.)

## DISCUSSION

## I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III. ANALYSIS

Rinaldi-Mishka argues that the ALJ decision was in error because the ALJ: (1) incorrectly assessed Rinaldi-Mishka's physical limitations in determining her RFC, (2) improperly analyzed Rinaldi-Mishka's credibility, and (3) rendered an improper Step Two analysis of the claimant's mental impairments.

### A. <u>Physical Limitations and RFC</u>

#### 1. *Treating Physicians*

Rinaldi-Mishka first argues that the ALJ failed to give proper (and controlling) weight to the opinions of three treating physicians: Drs. Alawad, Cooper, and Hirsen. The ALJ "must offer good reasons for discounting the opinion of a treating physician." *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011). Even if the decision includes sound reasons for refusing to give the treating physicians' assessment controlling weight, "the ALJ still would have been required to determine what value the assessment did merit." *Id.* The regulations require consideration of the "length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Id.* As an initial matter, while Dr. Alawad began treating Rinaldi-Mishka in 2006, Dr. Cooper first saw her in 2009 (and issued an RFC nine months later, in January 2010), while Dr. Hirsen treated her in 2010 and issued an RFC at that same time. (R. 280, 452, 519.) Thus the ALJ would be justified in according less weight to the latter two doctors' opinions as compared to Dr. Alawad or to the opinions of other treating physicians

with a more extensive relationship with the claimant. Indeed, the ALJ noted the brief treatment history with Dr. Hirsen, (R. 44), in rejecting his opinion.

The ALJ rejected Dr. Alawad's conclusion of disability, which was based in part on his indicating that the claimant could spend "no" time during an eight-hour workday using her hands for fine manipulations, grasping objects, or reaching overhead, (R. 388), a finding that the ALJ said was at odds with Rinaldi-Mishka's own testimony that she could write, zip, tie her shoes, and more. (R. 43.) The claimant argues that this ignores the actual manner in which the daily activities are carried out, and that sporadic activities are distinct from working a regular job. (Pl.'s Br. at 12.) This is true. But the ALJ relied on the daily activities not to prove that Rinaldi-Mishka could work a regular full-time job; rather, she relied on them to show that Dr. Alawad's RFC assessment did not deserve weight. And indeed, the ability to write, zip, or tie one's shoes—even sporadically—is in tension with the assessment that she could spend "no" time using her hands and fingers during the workday. In light of the deference owed to the ALJ's determination, *see Clifford,* 227 F.3d at 869, an apparent overstatement like Dr. Alawad's is sufficient to explain why a treating physician's opinion did not deserve any weight.

The ALJ rejected Dr. Cooper's RFC assessment, which had been based on findings of carpal tunnel and degenerative joint disease, because it was contrary to "objective findings." (R. 44.) These objective findings included a normal range of motion in the elbow and wrist, normal nerve conduction, an EMG that did not show radiculopathy, and 5/5 finger and hand grasp, (*id.*); as for the joint disease, the

objective findings included full range of motion in the neck, no evidence of hip arthritis, only early multi-level degenerative disc disease based on an MRI, and an unremarkable x-ray of the lumbosacral spine. (*Id.*) Dr. Durudogan did diagnose right arm radiculopathy, however, as well as right lateral epicondylitis (R. 311), and the ALJ gave no indication of whether she credited his findings as a treating physician. Dr. Fakhouri diagnosed right lateral epicondylitis and right carpal tunnel as well. (R. 284.) Dr. Stogin also diagnosed right lateral epicondylitis and noted the possibility of mild carpal tunnel. (R. 349.) All three of these treating doctors' diagnoses (which relate directly to the condition of Rinaldi-Mishka's right arm and wrist) went unmentioned by the ALJ. The ALJ could have weighed these doctors' opinions against the contrary evidence in the record, but the ALJ cannot cursorily and misleadingly dismiss a treating doctor's RFC assessment opinion without some justification that holds up to even deferential review. *See Clifford*, 227 F.3d at 872. Furthermore, even the consulting physician, Dr. Biale, diagnosed carpal tunnel syndrome. (R. 378.) The ALJ's decision to accord no weight to Dr. Cooper's RFC assessment in this case was unsubstantiated and therefore in error.

The ALJ also rejected Dr. Hirsen's RFC conclusion as lacking sufficient explanation of the evidence relied upon in reaching it, particularly since "the doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled." (R. 44.) Dr. Hirsen's RFC discussion is brief, although that is common to many similar reports in this area. In some cases, that would be insufficient to discount a treating

physician's opinion entirely. When the treater has a brief history with the patient, as here—his RFC assessment was issued at the same time that he began seeing the claimant, according to the record—however, the deference owed to his opinion by the ALJ is substantially lowered. *See Scott,* 647 F.3d at 739. The ALJ relied in part on this brief treating history in reaching her decision. (*Id.*) We therefore find no error in the ALJ rejecting Dr. Hirsen's opinion.

### 2. *Non-Treating Physicians*

Rinaldi-Mishka argues that the ALJ also erred in giving controlling weight to the RFC assessments of two state agency reviewers. The ALJ accepted the opinions of the two reviewers on the basis of their support in the objective evidence, other evidence of record, and the opinions of Dr. Fakhouri and Dr. Lim that the claimant could return to light work. (*Id.*) Yet as Rinaldi-Mishka points out, Dr. Fakhouri's opinion was that the claimant could return to "light duty work" shortly after she had carpal tunnel surgery, (R. 282), which she chose not to undergo. Furthermore, Dr. Fakhouri appeared to attach a different definition of "light work" than the one used in the Social Security Regulations. In October 2006, he recommended that Rinaldi-Mishka return to modified work activities, which he called "light duty work," but simultaneously restricted her to "no lifting, carrying, pulling or pushing greater than 5 pounds." (R. 284.) This is markedly different than the definitions used in SSDI appeals; it appears that what Dr. Fakhouri prescribed would be a version of sedentary work under our rules. *See, e.g.,* SSR 83-10 ("The regulations define sedentary work as involving lifting no more than 10 pounds at a time and

occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . .
The regulations define light work as lifting no more than 20 pounds at a time with
frequent lifting or carrying of objects weighing up to 10 pounds."). The ALJ failed to
take this into account and, to compound matters, cited the doctor's opinion as if it
supported the final conclusion. This is an error. *See* SSR 96-5p ("Adjudicators must
not assume that a medical source using terms such as 'sedentary' and 'light' is
aware of our definitions of these terms."). Furthermore, Dr. Lim does not appear to
mention any return to work, much less a particular exertion level. (R. 408.) The ALJ
had no basis to rely on Drs. Fakhouri and Lim in concluding that the claimant could
return to light work.

Beyond the statements of Drs. Fakhouri and Lim, however, the ALJ pointed
to nothing beyond the generic "objective and other evidence of record" in support of
the consulting, non-treating physicians' RFC conclusions. (R. 44.) This is precisely
the reason for the axiomatic rule that the ALJ "must at least minimally articulate"
her analysis to allow meaningful review. *Boiles*, 395 F.3d at 425. Without any
indication of the evidence the ALJ relied upon, we cannot say that her decision is
supported by "substantial evidence." 42 U.S.C. § 405(g).

The ALJ had justifiable reasons to discount two of the three treating
physicians' RFC assessments entirely, as described above, but she failed to
substantiate her decision to reject the assessment of Dr. Cooper and she offered no
justifiable reasons for relying upon the non-treating physicians' assessments of the
claimant's physical capabilities. These errors must be remedied upon remand.

## B.    Credibility

Rinaldi-Mishka argues that the ALJ erred in finding that her claims of impairment were not credible. An ALJ's credibility determination receives substantial deference on review unless it is patently wrong and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003). The ALJ must give specific reasons for discrediting a claimant's testimony, however, and the reasons must find support in the record and be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887-88. In this case, the ALJ offers a variety of reasons for finding a lack of credibility, but none of them meet the standard required for deference.

As an initial matter, the ALJ's credibility determination found that Rinaldi-Mishka's impairments "could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 43.) This boilerplate credibility template has been criticized by the Seventh Circuit as failing to indicate "in a meaningful, reviewable way . . . the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). More troubling still is that the template "implies that the ability to work is determined first and is then used to determine

24

the claimant's credibility." *Id.* at 645. Such an inverted approach violates the rule that a claimant's statements about the intensity and persistence of pain or other symptoms cannot be disregarded solely because they are not substantiated by objective medical evidence. *Id.* at 646 (*citing* SSR 96-7p). The claimant's credibility must be factored into the RFC determination, not result from it.

The ALJ cited the following reasons for finding Rinaldi-Mishka not credible in this case: her workers' compensation claim, which she settled; her work for one hour per day from the onset date through 2008; her decision to forgo carpal tunnel surgery and rely only on physical therapy and medication for her carpal tunnel syndrome; her rating of her pain as a six on a 1-10 scale; her testimony that she could walk four to six blocks; and her statement to her treating physician in 2008 that she was looking for a job. (R. 44-45.) When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[1] "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id.* at *1. We review the stated reasons in turn.

The ALJ offered no reason why a settled workers compensation claim is a reason to discount the claimant's credibility, and none is readily apparent, at least

---

[1] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

not to this Court. As Rinaldi-Mishka points out in her brief, settling for a substantial sum could conceivably be a boon to her credibility, since it suggests a serious injury. (Pl.'s Br. at 15.) The ALJ did not elaborate. Nor did the ALJ explain why pain that ranked a six on a 1-10 scale offered any insight into the claimant's credibility. We need not hypothesize on the ALJ's behalf; she must at least minimally articulate her reasons, and did not do so here.

As for Rinaldi-Mishka's past job and desire for employment, the ALJ offered no indication why the claimant's previous work of one hour per day weighs against her credibility. The question in this case is whether the claimant could return to a normal work week; again, if anything, her limited work schedule could help her credibility by suggesting that she is unable to work more than an hour per day. Rinaldi-Mishka also argues, persuasively, that the ALJ improperly took into account that the claimant told her physician that she was looking for a job. A claimant's ability to hold a job, desire to return to a job, or loss of a job for non-disability-related reasons does not disprove disability; the ALJ may consider it, but must also probe the claimant's capacity before finding that the claimant is capable of the previous work. *Henderson v. Barnhart*, 349 F.3d 434, 435-36 (7th Cir. 2003). A claimant's "mere 'determination' to work, without more, was not a proper basis for undercutting her credibility." *Anderson v. Astrue*, No. 09 C 2399, 2011 WL 5244358, at *2 (N.D. Ill. Nov. 2, 2011) (*citing Bartell v. Cohen,* 445 F.2d 80, 82 (7th Cir. 1971)). The claimant gave no indication that she believed she could do her prior

work, or any other particular work, and therefore her bare statement that she was looking for work should not undercut her credibility in applying for benefits.

Another factor that the ALJ cited was Rinaldi-Mishka's failure to get surgery to treat her carpal tunnel syndrome. Generally, we would credit the ALJ's determination that the claimant failed to pursue treatment with sufficient vigor. The claimant testified that she feared surgery could make the problem worse "at my age," based on the experience of her mother-in-law and a coworker's mother, who both had similar surgeries and saw their problems remain if not worsen. (R. 73.) This is neither inherently reasonable or unreasonable. Yet the ALJ made no mention of the claimant's rationale—and that is a problem. Moreover, the objective record included the recommendation from Dr. Stogin that surgery would *not* be prudent, (R. 349); the ALJ again did not even mention this seemingly relevant piece of evidence. It remains undeniable that the claimant did not get surgery, even in the face of two doctors suggesting she should; we make no determination whether this is sufficient to discredit the claimant's testimony, but strongly suggest that the ALJ remedy this potential deficiency on remand by clearly articulating why this choice casts doubt on the claimant's credibility.

The ALJ also found that the claimant's testimony of her limitations was disproportionate to the objective findings. Yet this logic rests first on a misstatement of what the claimant actually said in her testimony and second on a list of daily activities that appear to have nothing to do with the ability to work at the jobs at issue here. As for the first: the ALJ said, "Testimony of sitting for 15

27

minutes is not supported by any findings," and cited medical evidence of record. (R. 45.) In her testimony, the claimant actually made two relevant statements: "Sitting, like right now, I need to constantly be shifting every 15 to 20 minutes," (R. 63); "[if I had returned to work for an eight-hour day] I don't believe that they would have allowed me to have my restrictions of the 15 to 20 minutes per hour." (R. 68.) Nowhere did Rinaldi-Mishka say that she could only sit for fifteen minutes per hour. The ALJ misstated the claimant's testimony as only being able to sit for fifteen minutes, then used the misstatement against her. As to the second category: the ALJ noted the claimant's daily activities were not limited to the extent one would expect. Yet the daily activities included only sporadic events (like three hour field trips, which the claimant clarified required just watching the children but "nothing physical," (R. 66)) and very brief activities (like tying shoes or zipping zippers). The ALJ did not even minimally articulate why these activities are inconsistent with the medical evidence of record and we accord no deference to her determination.

Finally, the ALJ noted the possibility that Rinaldi-Mishka's treating physicians may have formed their opinions out of sympathy for her as their patient, or worse, that the claimant herself may have badgered those physicians into a helpful note or report for the purposes of her application. (R. 44.) But the ALJ adds that "[while] it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (*Id.*) In other words, the only

proof of such discrediting behavior is the medical record itself. This circular commentary renders the "possibility" of the presence of "such motives" meaningless: the ALJ offers no proof other than the proof relied upon for the overall credibility assessment. Such unsubstantiated comments offer no insight into the claimant's credibility and we need not weigh them further.

The ALJ offered several factors that could bear on the claimant's credibility, but only in one did she even arguably offer the minimal showing necessary to be accorded deference on her findings. On the whole, we find the credibility analysis sorely lacking in specificity and clarity, and this must be remedied on remand.

## C.    <u>Mental Impairments</u>

In assessing a claimant's mental limitations, the ALJ must follow the procedure known as the "special technique." 20 C.F.R. § 404.1520a. Once the ALJ determines whether the claimant has a medically determinable mental impairment, she must document that finding and rate the degree of functional limitation in four areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013) (*citing* 20 C.F.R. § 404.1520a(c)(3)). The ALJ rates each of the first three functional areas on a five-point scale (none, mild, moderate, marked, and extreme) and the last area on a four-point scale (one, two, three, and four or more). *Id.* The ratings correspond to levels of severity; if the impairment is considered severe, the ALJ must determine whether it meets or is equivalent to a listed mental disorder; and if it neither meets nor is equivalent to a listing, the ALJ incorporates the

mental limitations into the claimant's RFC at step four. *Pepper*, 712 F.3d at 365-66 (*citing* 20 C.F.R. § 404.1520a(d)(1)-(3)). The decision must "adequately discuss the significant history. . . examination and laboratory findings, and the functional limitations" relied upon and include "a specific finding as to the degree of limitation in each of the functional areas." *Id.* at 365 (*citing* 20 C.F.R. § 404.1520a(e)(4)). In other words, the ALJ must properly document the use of the special technique. *Id.*

Rinaldi-Mishka does not argue that the ALJ got it wrong, but merely that the ALJ failed to properly document her findings and thereby build the "logical bridge" between the evidence and the conclusion. The ALJ did conclude that the claimant's limitations were mild in each of the first three functional areas and that she had had no episodes of decompensation. (R. 38-39.) This supported to the ALJ's finding that the mental impairments were non-severe. (*Id.*) In the RFC determination, the ALJ reported that Dr. Buch found the claimant to relate well, behave appropriately, concentrate and pay attention well, and exhibit average memory. (R. 42.) Nevertheless, she was diagnosed with anxiety disorder and depressive features. (*Id.*) Another reviewing doctor found her to have anxiety and affective disorders, but found them non-severe, as the ALJ noted. (*Id.*) Indeed, the ALJ made mention of the limited evidence of the claimant's mental limitations, and the lack of a lengthier justification of the findings at step two can be ascribed at least in part to the lack of evidence. The claimant's failure to point to any missing evidence—and to rely entirely on the conclusory nature of the ALJ's determination—underscores this point. "[U]nder some circumstances, the failure to explicitly use the special

technique may . . . be harmless error." *Pepper*, 712 F.3d at 366 (*citing Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008)). This is such a circumstance. The claimant has not demonstrated that any error by the ALJ would have changed the outcome of the case. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000).

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff Antonietta Rinaldi-Mishka's motion for summary judgment [Doc. No. 14] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this order.

**SO ORDERED.**                          **ENTERED:**

**DATE:**    July 8, 2013           _____
                                    **HON. MARIA VALDEZ**
                                    **United States Magistrate Judge**